IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 05-00491 JMS |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING DEFENDANT'S |
| vs. | ) | MOTION TO SUPPRESS |
| | ) | STATEMENTS AND EVIDENCE |
| NINA S. MANNING, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE

Defendant Nina S. Manning ("Manning") seeks an order suppressing statements that she made to agents of the Naval Criminal Investigative Service ("NCIS") on June 20, 2005.  In addition, Manning seeks suppression of evidence seized from her home, also on June 20, 2005.  The court finds that Manning's June 20, 2005 statements are admissible at her trial and that there is no basis to suppress the evidence seized during the search of her home.  As a result, the Motion to Suppress Statements and Evidence is DENIED.

# I.  BACKGROUND

On November 9, 2005, a federal grand jury returned a single count indictment charging Manning with the September 30, 2002 second-degree murder of her infant daughter, Jasmine, at the Radford Terrace Naval Housing complex located in Honolulu, Hawaii.  According to the United States, Manning provided law enforcement with an exculpatory statement after Jasmine's death, and the Honolulu Department of the Medical Examiner ("Honolulu ME") issued a November 22, 2002 autopsy report classifying the death as "natural" based on a finding that Jasmine suffered from pneumococcal pneumonia.

In October 2004, the NCIS requested a review of the matter from the Armed Forces Institute of Pathology ("AFIP").  In an October 14, 2004 Consultation Report, AFIP's Associate Medical Examiner and Deputy Medical Examiner disagreed with the Honolulu ME's determination that Jasmine suffered from pneumococcal pneumonia.  Instead, they opined that "circumstantial findings are strongly supportive of asphyxia as a mechanism of death."  The cause and manner of death was classified as "undetermined."

By June 2005, Manning's husband David had been transferred to Naval Submarine Base Kings Bay, Georgia.  On June 20, 2005 at approximately 5:30 p.m., NCIS Agents Timothy Picard and Rick Rendon went to the Manning

home located off-base.  Both agents were in plain clothes; Agent Picard was

unarmed while Agent Rendon wore a concealed firearm around his ankle.

 David answered the door.  Both agents introduced themselves to

David and displayed their NCIS credentials.  At the request of Agent Picard,

Manning also came to the door.  Both agents introduced themselves to Manning

and again displayed their NCIS credentials.  Agent Picard then stated that the

NCIS was investigating activity that had occurred in Hawaii and asked if Manning

and David would agree to be interviewed.  He explained that NCIS wished to

conduct separate interviews to avoid any possible "taint."  Both agreed, with

David stating that he would stay at the Manning home for the interview where he

could watch their two young children.  Manning agreed to accompany the agents

to the NCIS office for her interview.

 Manning was offered a choice --  to drive to the NCIS office in her

own car or to ride with the agents.  She elected to ride with the agents, and sat in

the front seat of an unmarked NCIS vehicle (with Agent Picard driving and Agent

Rendon in the back seat).  The three-mile drive from the Manning home to the

NCIS office lasted approximately seven minutes.  Agent Picard testified that

although a gate directs and limits traffic coming onto the base, there is no

restriction from exiting the base.  Agent Picard also testified that Manning was

relaxed and appeared comfortable during this drive.  She discussed her marketing

of various health products, and apparently made a sales pitch to the agents.

Manning and the two agents entered the NCIS lobby area through an

unlocked front door.  One of the agents then entered a combination into a cipher

lock in order to open a secondary door into a hallway leading to the NCIS's

secured office area.[1]  The agents then took Manning to an interview room,

approximately eighteen feet by twenty-five feet in dimension.  The room had a

window, two upholstered chairs, an upholstered sofa, a table with a lamp, and a

desk with a chair.  Once in the room, Agent Picard asked Manning if he could shut

the door to the room for privacy.  Manning responded, "no problem."[2]

Before the interview process began, at approximately 5:50 p.m.,

Agent Picard told Manning that she was not under arrest; that she was free to leave

at any time; that no matter what she told the agents, at the end of the interview the

agents would take her home; and that she could terminate the interview at any time

and be driven home.  Manning stated that she understood.  At no time did the

agents inform Manning of her *Miranda* rights.

---

[1] This door had a cipher lock on the lobby-side of the door only.  In other words, entry into the office space was restricted, but exit from the office space into the lobby was unrestricted.

[2] The interview room door likewise had a cipher lock on the hallway side of door, but no lock restricting the exit from the office into the hallway.

Manning was then told that there was new medical evidence regarding Jasmine's death. Agent Picard again told her that she was not under arrest and that she did not have to consent to the interview. Manning stated that she wanted to continue the interview. Agent Picard then spent approximately ten to fifteen minutes explaining the history of the medical evidence concerning Jasmine's death. During this process, according to Agent Picard, Manning was shaking her head, appearing to indicate that she understood what he was saying.

Agent Picard then told Manning that he observed several "red flags" in the reports relating to Jasmine's death: (1) that Jasmine was an unplanned pregnancy; (2) that Manning had an extra-marital affair prior to Jasmine's birth; (3) that David had questioned if Jasmine was his child; (4) that at the time of Jasmine's death David was deployed and Manning was home alone with two children; (5) that Manning's original statement indicated that she had left Jasmine on her stomach, which is inconsistent with good parenting; and (6) that an ASP baton and plastic bag were found in Jasmine's crib. After Manning told the agents that her 13-month old daughter Cecilia placed the ASP baton and plastic in the crib, the agents told her that they did not believe it possible for a 13-month old

child to place an ASP baton in a crib.[3]  Several moments of silence followed.  At approximately 7:00 p.m., Manning stated that she had not been truthful, and that Cecilia had not placed the ASP baton in the crib.  Agent Picard then asked Manning to be truthful about what had occurred.[4]

Manning then stated that she had become upset with Jasmine's crying, placed Jasmine in a closet floor, closed the door, and went outside to smoke a cigarette.  Manning stated that she then returned upstairs, noticed that Jasmine was no longer crying, and fell asleep.  She further explained that she woke at 4:00 a.m., made a milk bottle, and went to feed Jasmine.  She then found Jasmine lifeless in the closet.  At this point, Manning began to cry for the first time during the interview.

Agent Picard questioned the veracity of this explanation, stating that in his experience placing a baby on a closet floor would not quiet the baby, and that parents do not often wake a baby for feeding.

At approximately 7:25 p.m., the interview ceased for a ten to fifteen minute break.  Manning went outside with Agent Rendon during this period.

---

[3] During this discussion, according to Agent Picard, he used a conversational, low-key tone of voice with Manning.  He also testified that Manning appeared to listen intently.

[4] Agent Picard explained that he intentionally did not use the word "lie" during the course of the interview, but instead used non-confrontational language in an effort to build trust with Manning.

As the interview continued, the agents again questioned Manning's version of events.  Manning then admitted that to "tire out" Jasmine she placed her hand over Jasmine's mouth.  She explained that her attempt did not work as Jasmine's hands were moving towards Manning's hand and Jasmine was squirming.  Manning stated that she then put one hand behind Jasmine's head and the other hand over her mouth and nose and she squeezed hard.  According to Agent Picard, Manning stated that she continued to squeeze until Jasmine went limp.  Manning described these events between 7:40 p.m. and 8:15 p.m.  Agent Picard testified that during this period, Manning spoke, cried, composed herself, and then began speaking again.

At approximately 8:15 p.m., Manning asked to use the restroom.  One of the agents showed her where the restroom was located.  She then went to the restroom alone and returned to the interview room without an escort.

After the break, Agent Picard testified that Manning explained that she tried CPR on Jasmine, put Jasmine in the closet, went outside to smoke a cigarette, and then went to sleep.  She explained how she placed a portion of a plastic bag and loosened some sheeting together in the crib as she planned to tell law enforcement that she found Jasmine dead in her crib.

7

At approximately 9:20 p.m., Manning again asked to use the restroom. She left the room and returned on her own. This break lasted ten minutes.

After the 9:20 p.m. break, Agent Picard asked Manning if she wanted to memorialize her statement. She agreed, and was given three options -- a written statement, an audio recording, or a video recording. Manning chose a video recording, which took place between 9:31 p.m. and 10:14 p.m. During this recording, Manning stated that she voluntarily came to the NCIS office, that she was told that she was not under arrest, and that she was free to leave at any time.

Agent Picard testified that Manning was not restrained throughout the entire interview, and that she never asked to leave or to terminate the interview. Agent Picard described his demeanor throughout the evening's interview as the same as he appeared during Manning's recorded statement. The video, viewed by the court, demonstrated that Agent Picard spoke in a conversational tone, did not raise his voice, was not threatening, and remained calm. Manning at times answered questions without difficulty, and at other times became emotional, crying and rubbing her eyes.

After another break, Agent Picard asked Manning's consent to search

her residence.[5]  Agent Picard testified that he read a "Permissive Authorization for

Search and Seizure" out loud, and then provided it to Manning.  The form states:

> I, Nina S. Manning, after being advised by Tim Picard
> that the Naval Criminal Investigative Service is
> conducting an investigation into (sic) death of Jasmine
> Manning, have been requested to permit a search of my
> (sic) 85 Creekside, St. Marys, GA.
>
> I have been informed of my constitutional right to refuse
> to permit this search in the absence of a search warrant.
> In full understanding of this right, I have nevertheless
> decided to permit this search to be made.
>
> This search may be conducted on 20Jun05 by NCIS, and
> I hereby give my permission to remove and retain any
> property or papers found during the search which are
> desired for investigative purposes.
>
> I make this decision freely and voluntarily, and it is made
> with no threats having been made or promises extended
> to me.

Ex. 22.

Agent Picard then asked Manning to read the form and if she agreed

to the consent search, to sign the form.  Manning agreed to the search, and signed

the form at 10:35 p.m.

---

[5] Manning apparently admitted to maintaining written journals during the interview.  The agents apparently sought consent in order to seize these journals.

Agents Picard and Rendon then drove Manning home.  She again sat in the front seat and was described by Agent Picard as "chatty."  After arriving at the house, David also agreed to a consent search.  The agents then conducted a search at the Manning residence between 10:50 p.m. and 11:39 p.m.

## II.  ANALYSIS

Manning argues that her June 20, 2005 statement must be suppressed because it was not proceeded by *Miranda* warnings and that she was in custody during questioning.   She further claims that, even if she was not in custody (and therefore no *Miranda* warnings were required), her statement must be suppressed as involuntary.  Finally, Manning claims that she did not voluntarily consent to the search of her home on June 20, 2005.

The court finds that Manning was not in custody during the June 20, 2005 interview.  That is, after examining the circumstances surrounding the interrogation, the court finds that Manning was not subjected to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam)(citation and internal quotation marks omitted).  Further, the court finds, under the totality of the circumstances, that Manning's statement to the NCIS agents was voluntary.

10

Finally, the court determines that Manning voluntarily consented to the search of her home.  Each of Manning's arguments is addressed in turn.

**A.     Manning Was Not in Custody During the June 20, 2005 Interrogation**

The warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), apply to custodial interrogations, meaning "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Id.* at 444.  *Miranda* warnings must be administered

> only where there has been such a restriction on a person's freedom as to render him in custody.  Whether a suspect is in custody turns on whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.  This inquiry requires a court to examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position.

*United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc) (internal quotation marks, citations, and alterations omitted).  Two discrete inquiries are essential.  First, "what were the circumstances surrounding the interrogation," and second, "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

11

Factors relevant to a custody determination include (1) the language used by the officers, including the language used to summon the individual; (2) the physical surroundings of the location where the questioning occurs; (3) the extent to which the suspect is confronted with evidence of guilt; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001).  Other factors may be relevant or even dispositive of the inquiry; these five factors "are simply ones that recur frequently."  *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002).[6]

That questioning takes place in a police station does not necessarily render the suspect "in custody."  *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *United States v. Coutchavlis*, 260 F.3d 1149, 1157 (9th Cir. 2001).  Further, "[b]eing aware of the freedom to depart, and in fact departing after questioning at a law enforcement office, suggest that the questioning was noncustodial." *Crawford*, 372 F.3d at 1060; *see also United States v. Brown*, 441 F.3d 1330, 1349

---

[6] Other circuits use different, and perhaps more useful, formulations. *See, e.g.,United States v. Plumman*, 409 F.3d 919, 924 (8th Cir. 2005) ("(1) whether law enforcement informed the suspect the questioning was voluntary, and the suspect was free to leave and was not under arrest; (2) whether the suspect had unrestrained freedom of movement during the questioning; (3) whether the suspect contacted the authorities or voluntarily agreed to official requests to answer questions; (4) whether law enforcement employed strong-arm tactics or deceptive stratagems during questioning; (5) whether the atmosphere of the interrogation was police dominated; or (6) whether law enforcement placed the suspect under arrest at the end of questioning.").

(11th Cir. 2006) (finding that if suspect told by the officers that he was not in custody and was free to leave, evidence of "extensive" restraint necessary to overcome a finding that suspect was not in custody); *United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998) (finding that statement to suspect that he was not under arrest, was free to leave at any time, and would not be arrested at the end of the interview was an "important factor" in the custody determination); *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) (stating that the "most obvious and effective means" of demonstrating that a suspect is not in custody "is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.").

Manning voluntarily accompanied the agents to the NCIS office.[7] Both agents wore civilian clothing, and neither displayed a weapon. Manning was given the option to drive her own car or to ride with the agents to the office. She elected to ride with the agents. Manning was also aware, at the time that she left her residence, that her husband would be caring for their two children.

Once at the NCIS office, Agent Picard informed Manning, prior to questioning, that she was not under arrest; that she was free to leave at any time;

---

[7] As a preliminary matter, the court finds that Agent Picard provided credible testimony. Agent Picard's demeanor appeared to the court as earnest and straightforward throughout his testimony.

that no matter what she told the agents, at the end of the interview the agents would take her home;[8] and that she could terminate the interview at any time and be driven home. Manning stated that she understood. After Manning was told that there was new medical evidence regarding Jasmine's death, she was again informed that she was not under arrest and did not have to consent to the interview. Manning elected to continue. At no time during the interview did the agents restrain Manning or suggest that her movements may be restricted in any manner. In fact, Manning took breaks outside the presence of the agents, confirming exactly what she was told by Agent Picard -- that she was not under arrest. In short, there was "no intimation that they would not permit [her] to leave if [she] desired." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005).

The interview took place in a large, comfortable appearing office. *See* Exs. 14-17. Although the door to the room was closed, it was not locked from the inside. Manning sat on a chair, while the agents sat on another chair and sofa.

Throughout the interview, the agents apparently remained calm, professional, and courteous; they neither raised their voices nor threatened

---

[8] In fact, the agents did not arrest Manning and did take her home at the conclusion of the interview.

Manning.  Although Manning became emotional at times, particularly at the end
of her recorded statement, she clearly understood the nature of the questioning.
The recorded statement demonstrates that after becoming emotional she was able
to compose herself and continue answering questions.

The parties dispute whether Agent Picard used deception during the
interview.  Agent Picard apparently told Manning that the AFIP report showed
that Jasmine died of asphyxia.  The report, however, states that the "circumstantial
findings are strongly supportive of asphyxia as a mechanism of death."  Although
Agent Picard appears to have overstated the report's findings, any deception was
minimal and did not directly implicate Manning.

Manning correctly points out that she was confronted with evidence
of her guilt.  Agent Picard pointed out several "red flags" and questioned
Manning's veracity (apparently without calling her a liar) during the course of the
interview.

Manning's strongest argument, however, is the duration of the
interview.  The agents arrived at the Manning residence at approximately 5:30
p.m., and the interview began at the NCIS office at approximately 5:50 p.m.
Manning was then interviewed, with several breaks, between approximately 5:50
p.m. and 9:20 p.m.  After another ten minute break, Manning made her recorded

statement between 9:31 p.m. and 10:14 p.m.  In total, the interview lasted over four hours.

The court has no difficulty determining that the interview was non-custodial at its initiation.[9]  Given the length of the interview and the fact that the agents questioned Manning's veracity as the interview progressed, the court has searched the record carefully to determine whether the non-custodial interview became, at some point in time, custodial.  In other words, at some point during the interview would a reasonable person believe that they were no longer free to leave?  The court believes not.

At the start of the interview, Manning was clearly told that she was not under arrest, was free to leave, she could terminate the interview, and that the agents would take her home.  There were simply no change in circumstances that would cause a reasonable person to believe that these ground rules had changed during the course of the interview.  In fact, Manning took several breaks, being outside the presence of both agents during two of these breaks.  Further,

---

[9] *United States v. Lee*, 699 F.2d 466 (9th Cir. 1982), is easily distinguished.  Lee was questioned in a closed FBI vehicle with two officers while police officers were in and around his home.  The court further found that although Lee was not forced into the FBI vehicle, a reasonable person could conclude that Lee might not have felt free to decline the request to be interviewed.  Such coercive circumstances were missing from Manning's interview.

at the beginning of the recorded statement, Agent Picard stated "[a]nd when you're

here, ah, I think I explained to you again that you're not under arrest.  Is that

correct?"  Manning agreed.  Ex. 21 A at 2.  Agent Picard then stated, "[a]nd that

you are free to leave at any time?"  Again, Manning agreed.  *Id*.  Under these

circumstances, a reasonable person would not believe that they were in custody

throughout the interview.[10]

**B.     Manning's Statements Were Voluntary**

> To determine if a statement is voluntary, the court considers whether,
>
> considering the totality of the circumstances, the
> government obtained the statement by physical or
> psychological coercion or by improper inducement so
> that the suspect's will was overborne.  A statement is
> involuntary if it is extracted by any sort of threats or
> violence, [or] obtained by any direct or implied
> promises, however slight, [or] by the exertion of any
> improper influence.

*Coutchavlis*, 260 F.3d at 1158 (internal quotation marks and citations omitted).

This factual inquiry centers on the conduct of law enforcement officers and the

suspect's capacity to resist.  *Mincey v. Arizona*, 437 U.S. 385, 399-401 (1978).

The surrounding circumstances and the "combined effect" of the entire course of

---

[10] Other courts have found that similarly lengthy interviews were non-custodial.  *See United States v. Pagan-Santini*, 451 F.3d 258, 263 (1st Cir. 2006) (nine hour interview); *United States v. Plumman*, 409 F.3d 919, 925 (8th Cir. 2005) (Three and one-half hours without breaks); *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (four hours); and *United States v. Lanni*, 951 F.2d 440, 442 (1st Cir. 1991) (four hours).

police conduct on the defendant are reviewed by the court. *See Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002).

Defendant's statements were clearly voluntary. No threats or violence were used. The agents acted professionally throughout the interview. There is simply no evidence that the agents used improper inducement or physical or psychological coercion such that Manning's will was overborne.

Manning's June 20, 2005 statements were voluntary and non-custodial. As such, her motion to suppress statements is DENIED.

## C.   Manning Voluntarily Consented to the Search of her Home

Voluntary consent to search constitutes a waiver of Fourth Amendment rights. *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973). Thus, the government may conduct a search based upon an individual's voluntary consent without a warrant and without probable cause, and any evidence discovered within the scope of the consent may be seized and admitted at trial. Because the court credits the testimony of Agent Picard that Manning did in fact consent to the search of her home, the only issue that remains is whether that consent was voluntary.

Courts examine the totality of the circumstances surrounding the consent to determine whether it was given voluntarily. *Id.* at 227. The

government must prove that the consent was voluntary by a preponderance of the evidence.  *United States v. Matlock*, 415 U.S. 164, 177 (1974).  The Ninth Circuit has identified the following five factors that courts should consider when determining whether consent to search was voluntary:  "'(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.'"  *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (*quoting United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)).  Each case of consent should be examined on its own facts and no one factor is determinative of the issue of voluntariness.  *Id.*

First, as discussed *supra*, Manning was not in custody when she gave consent to search.  The agents did not threaten Manning, did not restrain her, and did not display their weapons (the second factor that the court considers).  As to the third factor, although Manning was not advised of her *Miranda* rights, this factor is inapposite when a defendant is not under arrest and *Miranda* rights have not attached.  *See Patayan Soriano*, 361 F.3d at 504.

As to the fourth factor, Agent Picard specifically informed Manning that she had a right to refuse consent. This knowledge "is highly relevant in our analysis of whether consent is voluntary." *United States v. Meza-Corrales*, 183 F.3d 1116, 1125 (9th Cir. 1999).

Under the fifth factor of the voluntariness inquiry, courts are generally less likely to find that consent is voluntary when the request is presented as an ultimatum: Give us consent or we *will* obtain a warrant. *Patayan Soriano*, 361 F.3d at 504. No such ultimatum was made to Manning.

After weighing each of the five factors and examining the totality of the circumstances, the court finds that Manning voluntarily consented to the search of her home.[11] Her motion to suppress evidence is DENIED.

\\\

\\\

\\\

\\\

\\\

---

[11] Manning also claims that the evidence seized during the search of her house must be suppressed as "derived from the unwarned, illegal and involuntary statements obtained from defendant. . . ." Decl. of counsel ¶ 4. Because Manning's statements were lawfully obtained, the consent to search was not tainted by an illegal interrogation.

20

## III.  <u>CONCLUSION</u>

For the reasons stated herein, Defendant's Motion to Suppress

Statements and Evidence is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 4, 2007.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*United States v. Manning*, Cr. No. 05-00491 JMS, Order Denying Defendant's Motion to Suppress Statements and Evidence